1
2
3        **UNITED STATES DISTRICT COURT**
4        **NORTHERN DISTRICT OF CALIFORNIA**
5        **SAN JOSE DIVISION**
6

7   CHRISTIAN HULBERT,                    Case No.  20-cv-03687-BLF

8                    Plaintiff,

9           v.                            **ORDER GRANTING DEFENDANT'S MOTION UNDER RULE 52 AND DENYING PLAINTIFF'S MOTION UNDER RULE 52**

10  HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

11                   Defendant.

12

13

## I.   INTRODUCTION

Plaintiff Christian Hulbert ("Hulbert") filed this ERISA[1] action against Defendant Hartford Life and Accident Insurance Company ("Hartford") following Hartford's denial of his claim for long term disability benefits under a group insurance policy that Hartford issued to Hulbert's former employer, Infinera Corporation ("Infinera"). *See* Compl., ECF 1. The policy in question is Group Long Term Disability Policy No. GLT681103 ("Disability Policy"), which is one component of Infinera Corporation Employee Health and Welfare Benefits Plan ("the Plan"). AR 1376, ECF 28. Infinera is the plan administrator, and Hartford is the insurer. AR 1376, 1442.

The Disability Policy outlines what employees must show in order to be deemed "Totally Disabled." AR 1441. A worker is Totally Disabled when he is "unable to perform with reasonable continuity the Essential Duties necessary to pursue [his Own] Occupation in the usual or customary way" for a period of two years. *Id*. To continue to receive benefits beyond 24 months, the worker must show that he cannot perform with reasonable continuity in "Any Occupation." *Id*. Hulbert left his job on August 15, 2018, after tripping down three stairs and hitting his head,

---

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.

United States District Court
Northern District of California

resulting in a concussion. AR 1160, 1375. Hartford granted Hulbert short-term disability benefits. AR 175, ECF 27. Hulbert then applied for long-term benefits under the Disability Policy. AR 79. In April 2019, Hartford rejected Hulbert's long-term disability application, finding that Hulbert did not show he was disabled under the Plan. AR 114. Hulbert appealed this decision the following October, supported by new medical evidence. AR 12. Hartford rejected the appeal in December 2019. AR 84.

The parties filed cross motions for judgment pursuant to Federal Rule of Civil Procedure 52. *See* Pl.'s Mot., ECF 30; Def.'s Mot., ECF 32. The Court heard oral arguments on April 22, 2021. *See* Min. Entry, ECF 36. For the reasons discussed below, the Court issues the following findings of fact and conclusions of law and GRANTS Hartford's Rule 52 motion. The Court DENIES Mr. Hulbert's Rule 52 motion.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 52 provides that "[i]n an action tried on the facts without a jury ... the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "In a Rule 52 motion, as opposed to a Rule 56 motion for summary judgment, the court does not determine whether there is an issue of material fact, but actually decides whether the plaintiff is [entitled to benefits] under the policy." *Prado v. Allied Domecq Spirits and Wine Group Disability Income Policy*, 800 F. Supp. 2d 1077, 1094 (N.D. Cal. 2011) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)). In making that determination, the court must "evaluate the persuasiveness of conflicting testimony and decide which is more likely true" in order to make findings of fact that will be subject to review under a clearly erroneous standard if appealed. *Kearney*, 175 F.3d at 1095.

The parties agree that California Insurance Code § 10110.6 applies to this case. Pl.'s Mot. 15. The Court thus must determine, based on the evidence in the administrative record, whether Hulbert carries the burden of showing, by a preponderance of the evidence, that he was disabled under the terms of the Plan, without according deference to Hartford's denial of claim. *Kearney*, 175 F.3d at 1087-90; *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006);

United States District Court
Northern District of California

United States District Court
Northern District of California

*Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. 2011). To prevail, Hulbert needs to prove it is "more likely than not" that he was disabled under the terms of the Plan. *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016) (standard of proof in de novo ERISA disability claim is preponderance of the evidence); *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) (defining "preponderance of the evidence" as "more likely than not").

## III.    FINDINGS OF FACT

### A.    Mr. Hulbert's Occupation

Mr. Hulbert was employed as a Senior Support Technician (DOT No. 032.262-010, Sedentary, SVP - 7) with Infinera from 2013 until 2018. AR 257. This "sedentary" work is not physically demanding. AR 259. Hulbert spent most of the workday sitting, and he was not generally called upon to lift, carry, push, or pull objects. *Id*. However, this work had some mental rigor. AR 261. The work "require[d] that [Hulbert] be able to correctly analyze, troubleshoot, and evaluate computer network problems in order to quickly resolve problems [sic] issues." *Id*.

### B.    The Long-Term Disability Plan

While working for Infinera, Mr. Hulbert was enrolled in the Infinera Corporation Employee Health and Welfare Benefits Plan, which is an ERISA employee welfare benefits plan. AR 1442. Infinera is the Plan Administrator of the Plan. *Id*. Disability benefits under the Plan are insured by Hartford under Group Long Term Disability Policy No. GLT681103 issued by Hartford to Infinera. AR 1376.

In order to qualify for long-term benefits, a policyholder must show that he/she is "Totally Disabled" under the language of the Policy. The Disability Policy defines "Total Disability" as:

> Total Disability or Totally Disabled means during the Elimination Period and for the next 2 years, as a result of injury or sickness, you are unable to perform with reasonable continuity the Essential Duties necessary to pursue Your Occupation in the usual or customary way. After that, as a result of injury or sickness you are unable to engage with reasonable continuity in Any Occupation.

AR 1441.

"Your Occupation" means any job that shares the same "Essential Duties" as the job the policyholder worked when he/she became disabled. AR 1441. "Any Occupation" is any job that the policyholder is qualified for, so long as it has an earning potential greater than either (1) the product of the Indexed Pre-disability Earnings and the Benefit Percentage, or (2) the Maximum Monthly Benefit. AR 1438.

The Policy includes a provision for "Mental Illness and Substance Abuse." AR 1431. If a disability is caused by "Mental Illness" or "Substance Abuse," benefits are limited, and only payable for 24 months, unless the policyholder is confined to a hospital at the end of the 24-month period. *Id.* The policy defines "Mental Illness" narrowly, only recognizing illnesses listed in the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association. AR 1439.

### C.   Mr. Hulbert's Medical Treatment History

Mr. Hulbert has reported various symptoms since at least 2014. AR 372. A 2014 MRI of his brain revealed the presence of multiple cerebral cavernous hemangiomas ("cavernomas" or "angiomas"). *Id.* His sister and son, according to Mr. Hulbert, also have cerebral malformations, but he declined the recommended follow-up with adult genetics. *Id.* He has seen many medical professionals over the years to treat his various symptoms. Below is a survey of the relevant portions of Mr. Hulbert's medical history, organized in chronological order and by treatment provider. AR 330.

#### 1.   Sarim Mir

In March of 2017, Mr. Hulbert began seeing Dr. Sarim Mir, a neurologist. AR 704. Starting in 2017 and continuing until 2019, Mr. Hulbert repeatedly complained of headaches, memory issues, and difficulty reading to Dr. Mir and physician assistants practicing under his supervision. AR 704-745. Mr. Hulbert also complained about vision issues related to his headaches, AR 714, and dizziness, AR 730. Dr. Mir treated Mr. Hulbert's headaches through prescription medication and Botox injections. AR 704-745. Mr. Hulbert reported to Dr. Mir on

4

United States District Court
Northern District of California

June 21, 2017, that he "has trouble telling the difference between letters and numbers that look alike" while stressed at work, but he also stated that it has not affected his performance. AR 711. At the same visit, Dr. Mir prescribed Mr. Hulbert medication to deal with anxiety and referred Mr. Hulbert to a therapist. AR 711, 714. Dr. Mir's notes from his March 30, 2018 visit with Mr. Hulbert indicate that he started mental health treatment. AR 727, 730.

Mr. Hulbert agreed in 2018 that his memory issues mainly present when he is faced with stress. AR 719, 727. Dr. Mir further stated that Mr. Hulbert's "intermittent word finding difficulty is likely secondary to anxiety." AR 722, 730. After working with a mental health professional, Mr. Hulbert stated on August 10, 2018, that his headache and memory issues improved. AR 734. From this point on, Heather Hall, Dr. Mir's Physician's Assistant, reported in subsequent appointments that his headaches were "stable" and noted the continued improvement connected to working with a mental health provider. AR 735-743. In January 2019, Ms. Hall reported to Hartford that Mr. Hulbert's headaches were "not disabling." AR 1147-1148. In April 2019, Mr. Hulbert characterized his headaches as "tolerable." AR 740.

### 2.   2018 Meetings with Laura Hanes

In 2018, Mr. Hulbert began to see Laura Hanes, a psychiatric nurse therapist, for "social phobia" and anxiety. AR 656-57. On July 20, 2018, at a medication management session with Ms. Hanes, Mr. Hulbert reported that he began having auditory hallucinations the day prior. *Id*. One month later, Mr. Hulbert suffered a mild concussion after tripping down three stairs and hitting his head. AR 1160. While in the hospital getting treatment for his concussion, Mr. Hulbert experienced bradycardia, lowering his heartbeat to 52 b.p.m. *Id*. Mr. Hulbert returned to see Ms. Hanes for another medication management session on August 15, 2018, the day after his concussion. AR 665. At that session, Hulbert reported that he has been "hearing voices for years [and said] that they have only recently worsened." *Id*. He said that he never told anyone, including his prior therapist, about the voices and offered no reason for this omission. *Id*.

Mr. Hulbert returned to see Ms. Hanes in September 2018 and noted that he was "cleared medically by his neurologist, cardiologist and medical doctor." AR 668. Despite these clearances,

Mr. Hulbert continued to report symptoms of passing out and difficulties reading, saying that he was not comfortable returning to work until those symptoms subside. *Id*.

### 3. Thomas P. Pallmeyer

On September 7, 2018, Mr. Hulbert met with Dr. Pallmeyer, a psychologist. AR 1267. Dr. Pallmeyer administered a number of tests to Mr. Hulbert. Mr. Hulbert scored outside the normal limits of Conners' Adult ADHD Rating Scales (CAARS); Dr. Pallmeyer noted that the results "reflect a profile significant for the combined type of ADHD." AR 1268-1269. At the same time, Pallmeyer also noted that the built-in validity scale notes some "response inconsistency," casting doubt on the validity of the administration of the test.  AR 1269. Dr. Pallmeyer also found that Mr. Hulbert's results on the Test of Variables of Attention (TOVA) suggested a possibility that he was exaggerating his symptoms. *Id*. Testing administered by Dr. Pallmeyer indicated that Mr. Hulbert suffers from anxiety and depression. AR 1272. Mr. Hulbert placed in the "severely depressed" range of the Beck's Depression Inventory (BDI-II) test. *Id*. Mr. Hulbert also placed in the "high anxiety" range of the Beck Anxiety Inventory (BAI). *Id*. Dr. Pallmeyer concluded that Mr. Hulbert's depression and anxiety may be factors contributing to his attention difficulties. *Id*. Furthermore, Dr. Pallmeyer noted that Mr. Hulbert's drug use may have compromised the test results. *Id*. Nonetheless, Dr. Pallmeyer notes that the test results are consistent with a comorbid diagnosis of ADHD. *Id*.

In his examination, Dr. Pallmeyer asked Mr. Hulbert about his personal history. AR 1267. Mr. Hulbert offered that he served in the United States Air Force for a period of time, before he was discharged with a diagnosis of Borderline Personality Disorder. AR 1268. Dr. Pallmeyer's report shows that Mr. Hulbert also discussed his personal "history of alcohol and polysubstance abuse, including past use of methamphetamines, cocaine, and heroin." *Id*.

### 4. Rebecca Newcomer and Early 2019 Meetings with Laura Hanes

When Ms. Hanes was on maternity leave, Mr. Hulbert met with a new psychiatric nurse therapist, Rebecca Newcomer. AR 665, 674. On October 4, 2018, their first meeting, Mr. Hulbert reported that his auditory hallucinations were less significant. AR 674. On November 1, 2018, Ms.

1   Newcomer filled out an attending physician statement in support of Mr. Hulbert's short-term

2   disability claim. AR 1310. In this statement, she gave a primary diagnosis of ADHD and a

3   secondary diagnosis of major depression. *Id.*

4       In early 2019, Mr. Hulbert began meeting with Ms. Hanes again. AR 683. On January 9,

5   2019, Ms. Hanes discussed Mr. Hulbert's marijuana use with him and noted Dr. Pallmeyer's

6   report, which concluded that some of Mr. Hulbert's symptoms may be caused by substance abuse.

7   *Id.* Ms. Hanes noted that she would "decline to prescribe any further stimulants until [Mr. Hulbert]

8   has abstained from marijuana use." *Id.* Mr. Hulbert's testimony that he was clean from marijuana

9   was not enough; Ms. Hanes needed corroborating evidence from a urine sample. *Id.*

10       In notes from a February 5, 2019 meeting, Ms. Hanes wrote,

12       Is clear with me that he does not feel depression and anxiety [are] the result of his symptoms

13       and he feels the brain cavernoma that he has his [sic] what is causing his symptoms. However
the neurologist that he last saw told him that cavernoma would not cause any of his

14       symptoms. He is deciding to get a second opinion from a different neurologist. He
acknowledges that his pursuit of long-term disability is equally as stressful as his condition

15       that is preventing him from working and is definitely exacerbating his symptoms.

16   AR 692.

17       After Ms. Hanes returned from maternity leave and before Mr. Hulbert's April 2019

18   session with Dr. Marcella Wozniak, Mr. Hulbert met with Ms. Hanes five times for his depression

19   and ADHD. AR 683-697. On a three of these occasions, he communicated a theory that his

20   symptoms are caused by a neurological condition and not anxiety. AR 689, 692, 695. He

21   expressed frustration that "all the doctors say it is anxiety." AR 689.

22       **5.  Marcella Wozniak**

23       On April 9, 2019, Mr. Hulbert saw Dr. Marcella Wozniak, a neurologist at the University

24   of Maryland Medical Center. AR 334. He was referred to her for an evaluation for attention deficit

25   disorder. AR 333. Dr. Wozniak concluded that Mr. Hulbert does not have any gross language or

26   reading deficits, and that "he clearly does read despite stating multiple times he can not." AR 334.

27       Mr. Hulbert noted his symptoms in detail. AR 329. He noted that his symptoms include

28

United States District Court
Northern District of California

7

poor attention, headaches, decreased memory, and difficulty seeing numbers and letters. *Id*. Mr. Hulbert stated that his job involved careful review of computer code, and if he made a mistake while reviewing code, it could have serious financial implications for Infinera. *Id*.

Dr. Wozniak reviewed an April 2019 MRI of Mr. Hulbert's brain. Dr. Wozniak was clear that the new MRI showed no change in size or location of Mr. Hulbert's cavernomas. AR 327, 334. The newest MRI showed cavernomas that could not be seen on previous MRIs. AR 333. Since the April 2019 MRI was taken on more sensitive machinery, Dr. Wozniak assured Mr. Hulbert that the apparently "new" cavernomas "likely were present just not detectable on prior imaging." *Id*. Since the cavernomas had not physically worsened, Dr. Wozniak therefore concluded that the cavernomas are not the primary cause of Mr. Hulbert's symptoms. AR 327. Dr. Wozniak told Mr. Hulbert that the cavernomas cause only "mild difficulties which would not rise to level of disability that is specified by insurance or social security." *Id*. Accordingly, Dr. Wozniak referred him to psychiatry for adjustment to illness. *Id*. Dr. Wozniak also noted that "given small size of cerebral cavernous angiomas, results of be[d]side testing of language and reading and reported anxiety/social phobia, I would not expect more detailed testing to show large focal disabling cognitive dysfunction related to cerebral angiomas alone." AR 334.

Three days after speaking with Dr. Wozniak in April, Mr. Hulbert had a medication management session with Ms. Hanes. AR 698. Plaintiff told Ms. Hanes that Dr. Wozniak believed it was possible that his symptoms were caused by new cavernomas. *Id*. This report directly contradicts Dr. Wozniak's records. AR 327, 698.

On May 21, 2019, Dr. Wozniak met with Mr. Hulbert again. She reiterated her conclusions from their first meeting: the cavernomas are not obviously new or worsening. AR 319.

### 6. Ben Jones

Mr. Hulbert saw Dr. Ben Jones, a neuropsychologist, for examination and testing on April 23, 2019, and again on April 26, 2019. AR 515. He contacted Dr. Jones's office and stated that his neurologist, Dr. Wozniak, had requested that he have neuropsychological testing. *Id*. Generally, Mr. Hulbert performed well on the tests that Dr. Jones administered. AR 518. However, Dr. Jones

noted a number of tests that may indicate that Mr. Hulbert is impaired. *Id*. First, Dr. Jones found Mr. Hulbert to be mildly impaired on both the Time Score for his right hand and the Localization Score on the Halstead-Reitan Neuropsychological Test Battery. *Id*. Second, Dr. Jones found a large disparity between Mr. Hulbert's Verbal IQ (108) and his Performance IQ (134) scores on the Wechsler Adult Intelligence Scale. *Id*. Dr. Jones indicated that this suggests possible left hemisphere dysfunction. *Id*. Next, Dr. Jones found a significant difference in grip strength between Mr. Hulbert's left and right hands, strongly favoring the right hand. *Id*. Dr. Jones noted that this may be due to motor weakness in the right hemisphere of the brain. *Id*. Mr. Hulbert also made more errors using his left hand on the Reitan-Klove Tactile Form Recognition Test, which Dr. Jones concluded may again be related to the right hemisphere of Mr. Hulbert's brain. *Id*. Finally, Dr. Jones confirmed Mr. Hulbert's issues reading and recognizing symbols on the Reitan-Indiana Aphasia Screening Test, again indicating this finding is related to the right hemisphere of Mr. Hulbert's brain. *Id*.

Dr. Jones stated that Mr. Hulbert brought with him (1) Dr. Pallmeyer's report, (2) Mr. Hulbert's April 2019 MRI, and (3) Dr. Wozniak's report. AR 515. However, Dr. Jones's notes regarding the April 2019 MRI differ significantly from Dr. Wozniak's conclusions regarding the same MRI. Dr. Jones noted the alleged dates of three prior examinations (June 20, 2018, March 24, 2017, and October 5, 2015), and his notes state that on the April 2019 MRI "there are at least six additional lesions identified." AR 515. It is not clear what this comparison is based on, since Dr. Jones does not indicate that he reviewed prior MRIs from those dates—he just notes reviewing the April 2019 MRI. The notes also do not definitively reflect that he was adopting Mr. Hulbert's characterization of past MRI results.

Analyzing these reports in conjunction with the testing he administered, Dr. Jones found that the cavernomas "may" be consistent with his reported symptoms and test results. AR 519. Dr. Jones found that the cavernomas may be "slowly exerting more influence on the left hemisphere" while also noting that the cavernomas on that side of his brain have remained unchanged since 2015. *Id*. Furthermore, Dr. Jones offered that "The more recent lesions in the right hemisphere also may explain the recent onset of Mr. Hulbert's difficulty identifying numbers and letters that

come and go at this time but may become more consistent as the effects of the cavernous angiomas increase over time." *Id.* Dr. Jones ultimately diagnosed Mr. Hulbert with "anxiety disorder due to a general medical condition." *Id.*

### 7. Paul Heavner

Dr. Paul Heavner, an optometrist, saw Mr. Hulbert on May 28, 2019. AR 636. Mr. Hulbert reported that the severity of his double vision was "a little" and lasted "a few minutes." AR 636. He also reported that the problem began "months ago." *Id.* The eye exam itself did not produce any abnormal results. AR 637-38. Dr. Heavner diagnosed Mr. Hulbert with "monocular double vision in each eye most likely due to vascular changes in the brain." AR 638. Dr. Heavner recommended a follow-up with neurology and a return visit in one year. *Id.*

### 8. Enslin Aldrich

Mr. Hulbert did follow up with neurology as instructed. Dr. Enslin Aldrich, a physician, met with Mr. Hulbert and reviewed his brain MRI in June 2019. AR 527. Dr. Aldrich indicated that it is "unlikely" that the cavernomas are causing Mr. Hulbert's issues such as his reading difficulty. *Id.* Dr. Aldrich also agreed with Dr. Wozniak that the cavernomas are "quite stable" and the most recent MRI did not indicate that they are worsening. *Id.* Dr. Aldrich strongly recommended against brain surgery or gamma knife radiation to treat the cavernomas, since it was "seriously debatable" if these treatments would be beneficial to Mr. Hulbert at all. *Id.*

### 9. June 2019 Meeting with Laura Hanes

Plaintiff had a medication management session with Laura Hanes on June 6, 2019. AR 701. At this session, Plaintiff voiced the theory espoused by Dr. Jones that his cavernomas are causing his word finding issues. *Id.* Ms. Hanes was confused by this, writing in her report that "he has been claiming that for some reason suddenly he has been unable to work due to these angiomas causing word finding issues." *Id.* She continued that Dr. Wozniak "has stated that [Hulbert] is able to return to work [but Hulbert] does not feel he is able to return to work and has been laid off." *Id.*

United States District Court
Northern District of California

10

### 10. J. Marc Simard

Mr. Hulbert met with Dr. J. Marc Simard, a neurosurgeon, on June 25, 2019. AR 771. Dr. Simard's conclusions mirrored those of Dr. Aldrich, also finding that the risks of surgery outweigh the potential benefits. AR 772. Dr. Simard wrote: "I was also quite clear [in discussion with plaintiff] that the symptoms of reading difficulty and so forth that he has, I do not believe would be addressed by treating this lesion." *Id*.

### D.   Mr. Hulbert's Application for Short-Term Disability Benefits

An appeals specialist employed by Hartford categorized Mr. Hulbert's short-term benefits as stemming from "symptoms related to an intracranial injury after slipping and falling on his head. The injury resulted in complaints of psychosis and anxiety." AR 85. They appear to have begun on August 15, 2018.[2]

Records from the emergency department at Meritus Medical Center indicate that, on August 13, 2018, Mr. Hulbert tripped down three steps and hit his head but did not lose consciousness. AR 1160.[3] He was diagnosed with a concussion. AR 1162.

Mr. Hulbert reported to Ms. Hanes in the August 15 visit that he had an episode of bradycardia, where his heart rate dropped into the 30s. AR 665. His emergency room records confirm this. AR 1161-62. He underwent an EKG, which returned unremarkable results, and was discharged two hours later. AR 1162. Ms. Hanes did not have his emergency room records, and Mr. Hulbert reported to her that he was still suffering symptoms of bradycardia, including "feeling extremely tired, reportedly passing out when sitting, and feeling dizzy and forgetful." AR 665. Ms. Hanes wrote, "[a]t this point we have decided it is not safe for him to continue driving and going to work with his current cardiac symptoms." *Id.* She also prescribed Seroquel for his hallucinations and anxiety but instructed him to not start the medicine until he saw and received approval from his primary care doctor, given his current reported cardiac symptoms. *Id.*

_____

[2] Mr. Hulbert's short-term disability benefits lasted 90 days and terminated on November 13, 2018. AR 175. That would make the starting date August 15, 2018.
[3] Mr. Hulbert told the emergency room personnel that he had been recently taken off of Effexor and Paxil due to hallucinations and wondered if the weakness he was experiencing was due to withdrawal from these medications. AR 1160.

United States District Court
Northern District of California

1    On September 5, 2018, Mr. Hulbert saw Dr. Syyeda Syed, who is in the same practice

2    (Summit Behavioral Health) as Ms. Hanes. AR 668-70. Dr. Syed wrote that Mr. Hulbert had been

3    out of work since August 15 and had come to pick up his disability paperwork. AR 668. He

4    reported "feeling stressed out, as he still has symptoms of passing out, unable to read and

5    comprehend sometimes." *Id.* Dr. Syed wrote that Mr. Hulbert had been medically cleared by his

6    neurologist, cardiologist, and medical doctor. *Id.*

7    On October 4, 2018, another practitioner with Summit Behavioral Health, Ms. Newcomer,

8    noted that Mr. Hulbert remained on short-term disability "due to psychiatric and medical

9    conditions." AR 674-76. On his November 1, 2018 visit with Ms. Newcomer, he denied having

10   auditory hallucinations. AR 677. Ms. Newcomer's notes from her November 7, 2018 visit with

11   Mr. Hulbert reported that he is "[n]o longer hallucinating" and he is tapering off Seroquel. AR

12   681. Ms. Newcomer noted that Mr. Hulbert was continuing to request disability due to "inability

13   to recognize words consistently." *Id.* Ms. Newcomer wrote that "Neurology is told [sic] him it is

14   anxiety that he is experiencing causing reading difficulty." *Id.*

15   Short-term disability benefits lasted 90 days, terminating on November 13, 2018. AR 175.

16

17   **E.    Mr. Hulbert's Application for Long-Term Disability Benefits**

18   On November 5, 2018, Mr. Hulbert submitted an application for long-term benefits under

19   the Plan. AR 79. When reviewing Mr. Hulbert's application, Hartford sent a number of questions

20   to Ms. Hanes. In her January 21, 2019 response, Ms. Hanes set a timeline to return to work of six

21   months. AR 1152. Ms. Hanes also noted that she stopped prescribing medication due to concerns

22   about Mr. Hulbert's marijuana dependence. AR 1153. Finally, Ms. Hanes concluded that "[she]

23   does] not believe ADHD is what is disabling. [She] suspect[s] his anxiety/conversion symptoms

24   are at fault." *Id*.

25   In support of his application, Mr. Hulbert submitted an attending physician statement from

26   Ms. Hanes, which she completed on January 28, 2019. AR 1136. In the statement, Ms. Hanes

27   listed a primary diagnosis of major depressive disorder and a secondary diagnosis of ADHD,

28   combined type. *Id*. Ms. Hanes noted that Mr. Hulbert has reported severe deficits in attention,

United States District Court
Northern District of California

12

1    concentration, and memory, but Ms. Hanes did not have sufficient observation or testing to

2    independently confirm these deficits. *Id*. Ms. Hanes set a timeline of approximately six months for

3    Mr. Hulbert to return to work. AR 1137.

4         Hartford employed a medical doctor named Dr. Fariha Qadir to review Mr. Hulbert's file

5    and determine if he is eligible for long-term disability under the plan. AR 1086. On March 25,

6    2019, Dr. Qadir issued a report finding that Mr. Hulbert was not disabled under the plan. Dr. Qadir

7    noted that Mr. Hulbert has a valid diagnosis of depression and anxiety, but his reported symptoms

8    of these conditions were not disabling. AR 1089. Dr. Qadir downplayed the importance of Mr.

9    Hulbert's ADHD diagnosis from Dr. Pallmeyer, noting that Dr. Pallmeyer reported potential

10   symptom exaggeration and that Mr. Hulbert's substance abuse may be a cause of his symptoms.

11   AR 1089, 1087.

12        Dr. Qadir attempted to contact Ms. Hanes while preparing his report but could not reach

13   her. AR 1088. On March 29, 2019, four days after Dr. Qadir finished her report, Ms. Hanes sent a

14   letter to Hartford. AR 1102. She wrote that she had attempted multiple times to return Dr. Qadir's

15   calls. *Id.* Ms. Hanes also wrote, "I agree, no impairment that would affect his ability to work at

16   this time. Difficulty reading which is subjective, would impact his ability to function but this

17   appears to be unrelated to depression, anxiety at this time." *Id*

18        In accord with Dr. Qadir's findings and Ms. Hanes's letter, Hartford denied Mr. Hulbert's

19   claim for long term disability on April 4, 2019. AR 116.

20

21        **F.    Mr. Hulbert's Appeal for Long-Term Disability Benefits**

22        In October 2019, Mr. Hulbert filed an appeal to Hartford, seeking to overturn its April

23   2019 decision denying him of long-term disability benefits. AR 9. In support of the appeal, Mr.

24   Hulbert submitted more evidence, including the report of Dr. Jones and a Vocational

25   Rehabilitations Assessment by Wallace Stanfill. AR 224, 517.

26        Walter Stanfill is a Certified Rehabilitation Counselor. AR 224. Mr. Stanfill interviewed

27   Mr. Hulbert via telephone and reviewed his medical records. *Id*. Mr. Stanfill sent his report

28   directly to counsel for Mr. Hulbert. *Id.* Mr. Stanfill's summation of Mr. Hulbert's medical record

United States District Court
Northern District of California

13

does include one error of note. Mr. Stanfill states that "Mr. Hulbert's treating neurologist, Dr. Marcella A. Wozniak, placed him on medical leave as of August 15, 2018." AR 225. However, Dr. Wozniak first saw Mr. Hulbert on April 9, 2019. AR 334. It was Ms. Hanes, the psychiatric nurse therapist, who recommended Mr. Hulbert stop attending work due to cardiac problems after a fall down several stairs. AR 665.

Mr. Stanfill determined that Mr. Hulbert is disabled from any profession for which he is trained or reasonably qualified. AR 230. He based this decision on Dr. Wozniak's treating records, AR 230, but Dr. Wozniak explicitly found that, as of April 9, 2019, Mr. Hulbert was not disabled and does not have any gross language or reading deficits or issues recognizing symbols, AR 334.

On appeal, Hartford employed Dr. David Lang, a psychiatrist, and Dr. Scott Sautter, a neuropsychologist, to review Mr. Hulbert's medical records. AR 87. Faced this time with a much larger medical record, both doctors concluded that Mr. Hulbert was not disabled under the plan. AR 84-90.

In his report, Dr. Lang criticized Dr. Jones's report because it did not properly utilize embedded validity testing. AR 100. In response to this critique, Dr. Jones wrote a letter in support of Mr. Hulbert's appeal. Dr. Jones defended the lack of validity testing in his test administrations, pointing to his academic credentials and experience administering these tests. AR 223. Dr. Sautter responded to this letter, harshly criticizing Dr. Jones's decision to rely only on his professional judgment. AR 209. Dr. Sautter writes that it is "necessary to conduct both symptom and performance validity measures in neuropsychological assessment to maintain scientific integrity." *Id*. Dr. Sautter and Dr. Lang did not change their opinions in light of Dr. Jones's letter. AR 209, 213.

In accord with the reports from Dr. Lang and Dr. Sautter, Hartford denied Mr. Hulbert's appeal on December 19, 2019. AR 88.

## IV.    CONCLUSIONS OF LAW

A participant in an ERISA plan may bring a civil action under § 502(a)(1)(B) "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or

14

to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "When a district court reviews de novo a plan administrator's determination of a claimant's right to recover long term disability benefits, the claimant has the burden of proving by a preponderance of the evidence that he was disabled under the terms of the plan." *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1162-63 (9th Cir. 2016). "In a trial on the record, the court can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1123 (C.D. Cal. 2015) (internal quotations and citations omitted).

At the hearing, counsel for Mr. Hulbert clarified that he is seeking a determination from this Court that Mr. Hulbert entitled to 24 months of long-term disability benefits on account of being unable to perform, with reasonable continuity, the essential duties necessary to pursue his occupation in the usual or customary way, which is how the Plan defines "Total Disability." AR 1441. Further, Mr. Hulbert is seeking that the Court remand this case back to Hartford to determine if he is eligible for further benefits beyond the initial 24 months as a result of not being able to perform "any occupation." Counsel for Mr. Hulbert also explicitly stated that he is not pursuing a claim based on substance abuse. The Court finds that Mr. Hulbert has not established by a preponderance of the evidence that he is disabled under the Plan and entitled to long-term disability benefits.

The Court does not dispute Mr. Hulbert's contention, and the cases he cites, that establish that Mr. Hulbert's functional limitations, rather than the titles of his diagnosis, dictate whether he is disabled under the Plan. Mot. 20-21; *see Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 880 (9th Cir. 2004) ("That a person has a true medical diagnosis does not by itself establish disability. Medical treatises list medical conditions from amblyopia to zoolognia that do not necessarily prevent people from working."), *overruled in part on other grounds by Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955, 969 (9th Cir. 2006). However, as detailed below, the Court is persuaded by the findings of Ms. Hanes, Dr. Wozniak that Mr. Hulbert does not have functional limitations that rise to the level of rendering him disabled as defined by the Plan. Additionally, the Court does not find the opinion of Dr. Jones or Mr. Stanfill persuasive.

As a threshold matter, the Court finds Mr. Hulbert's arguments regarding Hartford "cherry picking" the best evidence irrelevant here on this de novo review. Mot. 19; Pl.'s Reply 9-10, ECF 33. "Under a de novo standard of review, the Court performs 'an independent and thorough inspection' of the Plan administrator's decision to determine whether the Plan administrator correctly or incorrectly denied benefits." *Western v. Unum Life Ins. Co. of Am.*, No. CV 16-9527-JFW (ASX), 2018 WL 6071090, at *11 (C.D. Cal. July 3, 2018) (quoting *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006)), *aff'd*, 798 F. App'x 154 (9th Cir. 2020)). The Court had conducted its own review of the administrative record and reached its own conclusions.

### A.    Mr. Hulbert Has Not Established By a Preponderance of the Evidence that He Suffers from Functional Limitations that Cause Him to Be Disabled from His Occupation

The Court will review Mr. Hulbert's possible grounds for disability below.

### 1.    Mr. Hulbert Has Not Established that He Is Disabled by His Cavernomas

Mr. Hulbert has brain cavernomas. AR 319, 327, 372, 519, 527. Multiple medical professionals confirmed this fact. *Id*. Mr. Hulbert urges the Court to find that a neurological condition potentially related to the cavernomas is the cause of his subjective symptoms, and that those symptoms are disabling. Mot. 21; Pl's Reply 10-11. However, the substantial majority of medical professionals who examined Mr. Hulbert did not find these cavernomas to be the cause of his reported symptoms. The existence of a medical condition alone does not establish the existence of a disability. *See Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) ("Many persons with serious heart conditions work at stressful jobs for years without ill effects. Think of President Eisenhower, Vice President Cheney, and Associate Justice Stevens.").

Dr. Jones is the only treating professional who found that the cavernomas "may" be causing Mr. Hulbert's symptoms. However, irregularities in Dr. Jones's testing and conclusions cause the Court to find his report less credible and assign it less weight than those of other medical professionals who treated Mr. Hulbert. *See Kearney*, 175 F.3d at 1095 (stating that the Court must

"evaluate the persuasiveness of conflicting testimony and decide which is more likely true").

Dr. Jones ignored the embedded validity testing in his tests on Mr. Hulbert. AR 100. Dr. Jones instead relied only on his "professional judgment" and therefore trusted that Mr. Hulbert's responses were valid. AR 223. Dr. Sautter, Hartford's neuropsychologist, sharply criticized this choice, saying that it undermined the "scientific integrity" of the test. AR 209. Both of Hartford's paper reviewers called Dr. Jones's conclusions into question on this basis. AR 209, 213. Dr. Jones's failure to use validity testing is especially problematic when considered in conjunction with Dr. Pallmeyer's report. When Dr. Pallmeyer administered testing on Mr. Hulbert months earlier, the embedded validity tests showed "response inconsistency." AR 1269. Dr. Pallmeyer offered that Mr. Hulbert's drug use may have compromised the test, and therefore the results of the test may not be valid. AR 1272. Dr. Jones reviewed Dr. Pallmeyer's report. AR 515. Therefore, Dr. Jones should have known that testing on Mr. Hulbert had triggered validity problems in the past, and Dr. Jones's decision to nonetheless ignore embedded validity testing prompts causes the Court to view his report as less credible than the reports from Dr. Wozniak and Dr. Aldrich.

Contrary to Dr. Jones's assumption, Dr. Wozniak found that the apparently new cavernomas on the April 2019 MRI appeared only because of the use of more sensitive machinery. AR 333. In essence, these cavernomas were previously present, and the fact that doctors can see them for the first time now does not mean they are new. Dr. Aldrich implicitly agreed with Dr. Wozniak, as he noted that the recent MRI showed Mr. Hulbert's cavernomas were stable. AR 527. The Court finds the reports from both doctors persuasive and finds that Mr. Hulbert has not established by a preponderance of the evidence that he is disabled due to his cavernomas.

### 2. Mr. Hulbert Has Not Proven that His Other Symptoms Are Disabling by a Preponderance of the Evidence

Over years of treatment, medical professionals suggested that Mr. Hulbert's reported symptoms could be caused by mental illnesses such as ADHD, anxiety, and depression. AR 1136, 1153, 1272, 1310. Treating professionals also suggested that Mr. Hulbert's symptoms may be

17

caused by substance abuse. AR 1153, 1272. Other than Dr. Jones, whom the Court has already addressed, no treating professional ever found Mr. Hulbert's symptoms disabling outside of his short-term benefits period. The Court finds that the degree and effect of Mr. Hulbert's reported symptoms are unconfirmed by reliable objective evidence, and the objective evidence suggests Mr. Hulbert has a tendency to exaggerate his symptoms. Additionally, Ms. Hanes, wrote in March 2019 that Mr. Hulbert had "no impairment that would affect his ability to work at this time" and that his reading difficulty was "subjective." AR 1102. Accordingly, the Court does not find Mr. Hulbert to be disabled by a preponderance of the evidence.

A plan administrator is under no obligation to accept subjective complaints when the complaints are subject to verification by objective medical evidence. *Seleine v. Flour Corp. Long–Term Disability Plan*, 598 F. Supp. 2d 1090, 1102 (C.D. Cal. 2009), *aff'd*, 409 Fed. App'x. 99, 101 (9th Cir. 2010); *see also Sanchez-Levine v. Metro. Life Ins. Co.*, No. CV 16-3179 DMG (SKX), 2017 WL 4286139, at *10 (C.D. Cal. Sept. 26, 2017), *Bratton v. Metropolitan Life Ins. Co.*, 439 F. Supp. 2d 1039, 1052 (C.D. Cal. 2006) ("A finding of disability based on mere subjective complaints would open the Plan up to malingering and would greatly hamper [the insurance company] from exercising its fiduciary role of scrutinizing requests for benefits."). Mr. Hulbert has reported a number of other symptoms over recent years. These symptoms include difficulty reading, memory difficulty, attention issues, and optical issues. AR 329, 636, 668, 704, 772, 1136. All of these symptoms are subjective and difficult to independently confirm and in fact contradict the examination findings of his most consistent treating medical professionals. The Court finds that Mr. Hulbert's self-reported symptoms are less reliable that the results of his medical evaluations by Ms. Hanes and Dr. Wozniak in particular. *See Biggar v. Prudential Ins. Co. of Am.*, 274 F. Supp. 3d 954, 968 (N.D. Cal. 2017) (finding objective evidence more credible when self-reported symptoms contradicted doctors' findings), *Langlois v. Metro. Life Ins. Co.*, No. 11-CV-03472 RMW, 2012 WL 1910020, at *14 (N.D. Cal. May 24, 2012) (same).

On her January 2019 attending physician statement in support of Mr. Hulbert's application for long-term disability, Ms. Hanes specifically indicated to Hartford that Mr. Hulbert's symptoms are only "self-reported." AR 1136. Ms. Hanes indicated that she did not have sufficient

observation or testing to independently confirm his symptoms. *Id.* Ms. Hanes, who treated Mr. Hulbert frequently in 2018 and 2019, also stated in her March 29, 2019 letter that "no impairment" would "affect his ability to work at this time." AR 1102. Dr. Wozniak administered a bedside neurological exam, which tested Mr. Hulbert's ability to read. AR 329. This test did not confirm Mr. Hulbert's reported symptoms. *Id.* To the contrary, he performed well on this exam. *Id.* In Dr. Wozniak's words: "he clearly does read despite stating multiple times he can not." *Id.* The Court finds the evidence presented by these two treating professionals persuasive. The Court also finds the results of Dr. Pallmeyer's objective testing of Mr. Hulbert persuasive, as Dr. Pallmeyer found that Hulbert was inconsistent in his responses, potentially due to symptom exaggeration. AR 1269.[4]

The Court also finds that Mr. Hulbert expressed to his treating professionals that he recovered from some of his symptoms. Specifically, he stated that he recovered from his headaches, bradycardia, and auditory hallucinations. AR 677, 740, 903. Both Mr. Hulbert and his treating professionals at Mir Neurology indicated that Mr. Hulbert's issues with headaches subsided. Less than a week before he left his job at Infinera, Mr. Hulbert stated that his headaches had improved. AR 734. On September 21, 2018, Ms. Hall wrote after treating Mr. Hulbert, "Patient's headaches are stable…Headaches and memory have improved with working with a mental health provider and encouraged to continue." AR 738. In January 2019, Ms. Hall stated that Mr. Hulbert's headaches were "not disabling." AR 1147-48. In April 2019, Mr. Hulbert said that his headaches were "tolerable." AR 740.

Mr. Hulbert also recovered from bradycardia. At their September 5, 2018 meeting, Ms. Hanes noted that Mr. Hulbert was cleared by a cardiologist. AR 668. When Mr. Hulbert met with Dr. Heavner in May 2019, Mr. Hulbert stated that he had no cardiovascular issues. AR 903.

Mr. Hulbert claimed that he is no longer affected by auditory hallucinations. In July and

---

[4] Further evidence of Mr. Hulbert's tendency to exaggerate can be found in his communications to Ms. Hanes. Mr. Hulbert gave an incorrect account of Dr. Wozniak's medical findings to Ms. Hanes. AR 327, 698. Mr. Hulbert claimed that Dr. Wozniak said it was possible that his symptoms were caused by new cavernomas. *Id.* This report directly contradicts Dr. Wozniak's records. *Compare* AR 327 *with* AR 698. The Court finds this evidence persuasive in evaluating Mr. Hulbert's credibility.

United States District Court
Northern District of California

1    August of 2018, Mr. Hulbert reported "hearing voices." In November 2018 Mr. Hulbert expressed

2    that he no longer dealt with auditory hallucinations. AR 677. After November 2018, Mr. Hulbert

3    never again reported auditory hallucinations.

4         The Court does not find Mr. Stanfill's report finding Mr. Hulbert totally disabled from any

5    occupation for which he is trained and reasonably qualified persuasive. AR 224-231. Mr. Stanfill,

6    a rehabilitation counselor, interviewed Mr. Hulbert via telephone on October 9, 2019. AR 224. He

7    categorizes Mr. Hulbert's headaches as symptoms of his angiomas, which is not a finding

8    supported by any medical professional. AR 224-25. As previously noted, he misstates that "Mr.

9    Hulbert's treating neurologist, Dr. Marcella A. Wozniak, placed him on medical leave as of

10   August 15, 2018," and he states this in the same paragraph detailing the headaches as "symptoms"

11   of the allegedly worsening angiomas. *Id.* He bases his conclusion that Mr. Hulbert is totally

12   disabled from any occupation for which he is trained and reasonably qualified on Dr. Wozniak's

13   treating records, which he states "indicate that Mr. Hulbert is unable to perform the visual and

14   sustained concentration activities required in the job of a Senior Support Technician." AR 230.

15   This completely misrepresents Dr. Wozniak's findings. Dr. Wozniak was clear that Mr. Hulbert's

16   cavernomas were not worsening and were not the primary cause of his symptoms. AR 327, 333.

17   Dr. Wozniak told Mr. Hulbert that the cavernomas cause only "mild difficulties which would not

18   rise to level of disability that is specified by insurance or social security." 327. Because Mr.

19   Stanfill's report relies on a complete misrepresentation of Dr. Wozniak's findings, the Court does

20   not find it persuasive.

21        Weighing all the evidence, the Court finds that Mr. Hulbert has not established by a

22   preponderance of the evidence that any of his symptoms are disabling.

23
### 3. Hartford's Decision to Pay Short-Term Benefits Does Not Weigh Against its Decision to Deny Long-Term Benefits in This Case.

24

25        In his motion, Mr. Hulbert argues that, because Hartford granted short-term benefits to

26   him, its failure to grant long-term benefits should be "subject to heightened suspicion." Mot. 21-

27   22. The Court disagrees. The fact that Mr. Hulbert received short-term disability benefits may be

28

United States District Court
Northern District of California

20

considered evidence of his disability, but Courts have made clear that they "are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1296–97 (9th Cir. 2010) (quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)).

Here, Mr. Hulbert received short-term benefits due to cardiac issues stemming from his episode of bradycardia while in the emergency room after tripping and hitting his head and his reports of auditory hallucinations. AR 85. However, Ms. Hanes's records show that Mr. Hulbert was cleared by a cardiologist before their September 5, 2018 meeting. AR 668. Furthermore, Mr. Hulbert told Dr. Heavner that he had no cardiovascular issues when they met in May 2019. AR 903. He also reported in November 2018 that he was no longer hallucinating. AR 681. The fact that Hartford issued short-term benefits for Mr. Hulbert's auditory hallucinations and cardiovascular issue—both of which resolved—does not affect the future decision to issue long-term benefits for a separate neurological issue.

### 4. Hartford's File-Only Review Echoes the Findings of Mr. Hulbert's Treating Medical Professionals

Finally, Mr. Hulbert argues that Hartford's decision not to conduct an in-person examination of him should "raise questions" regarding its validity. Mot. 17-19. The Court does look carefully at the entire record when there is a file-only review, but the Court does not find that review to be automatically less credible, especially in this case when it relied on the consistent opinions of Mr. Hulbert's treating physicians, who found that he was not disabled. "[C]onsulting physicians' opinions based on reviews of medical records are an acceptable basis of an administrator's determination." *Broyles v. A.U.L. Corp. Long–Term Disability Ins. Plan*, 2009 WL 3817935, *6 (N.D. Cal. 2009) (citing *Jordan v. Northrop Grumman Corp.*, 370 F.3d at 879-80). Mr. Hulbert cites cases where the file reviewing physicians reached different conclusions than the treating medical professionals, but that is not the situation here. *See* Mot. 18 (citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (noting every doctor who personally examined Salomaa concluded that he was disabled) and *Rabbat v. Standard Ins. Co.*,

1   894 F. Supp. 2d 1311, 1321-22 (D. Or. 2012)). Here, the file-reviewing physicians reached the

2   same conclusion about Mr. Hulbert's lack of disability that Mr. Hulbert's own most frequent

3   treating medical professionals reached. On this basis, the Court finds that the conclusion reached

4   by Drs. Lang and Sautter are more credible than those reached by Dr. Jones and Mr. Stanfill.

5          It is this Court's conclusion that Mr. Hulbert has not proven by a preponderance of the

6   evidence that he is entitled to long-term disability benefits under the Plan.

7   **V.     ORDER**

8      Consistent with the findings of fact and conclusions of law set forth above:

9          (1) Mr. Hulbert's Rule 52 motion for judgment is DENIED; and

10         (2) Harford's Rule 52 motion for judgment is GRANTED.

11         **IT IS SO ORDERED.**

12

13  Dated: August 2, 2021

14                                                  _____

15                                                  BETH LABSON FREEMAN
                                                    United States District Judge
16

17

18

19

20

21

22

23

24

25

26

27

28